UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
         Plaintiff,            )
                               )
v.                             )          No. 3:09-CR-91
                               )          (VARLAN/SHIRLEY)
DAMIEN OSHEA ELMORE,           )
                               )
         Defendant.            )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court,

as may be appropriate. Defendant Damien Oshea Elmore ("the Defendant") was charged in an

Indictment [Doc. 1] on July 21, 2009, with knowingly possessing, in and affecting commerce, a

firearm after previously having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1).

On September 11, 2009, the Defendant, through counsel Attorney Kim Tollison, filed two

Motions to Suppress Evidence [Docs. 12 and 13]. On October 6, 2009, the Defendant withdrew his

second suppression motion [Doc. 13] and filed an amended version of his first suppression motion

[Doc. 19] and an accompanying memorandum in support [Doc. 20]. The Defendant's amended

suppression motion asks the Court to suppress a handgun that was discovered on the ground beneath

the passenger side of a vehicle that he was driving during an investigative stop that occurred on July

13, 2009. The Defendant argues that the investigative vehicle stop was a "seizure" of his person

within the meaning of the Fourth Amendment that was not justified by a reasonable suspicion that

either he or the passenger in the vehicle, Calvino McAlister, were engaged in criminal activity.

[Doc. 20 at 2]. The Defendant argues that there was no factual basis upon which police could have formed the reasonable suspicion required to justify the investigative stop. [Doc. 20 at 3]. The Defendant concludes that the rights guaranteed to him by the Fourth Amendment were violated, and he argues accordingly that the handgun discovered on the ground during the investigative vehicle stop must be suppressed. [Doc. 20 at 4]. The Defendant argues that "anything that transpired after [the initial stop]," including "seeing the holster in the car and finding the gun underneath the car," is fruit of the poisonous tree that must be suppressed. [Tr. 20-21].

The Government argues in response that the investigative stop of the Defendant did not violate the Defendant's Fourth Amendment rights because police "had both reasonable suspicion and probable cause of an ongoing crime." [Doc. 22 at 4]. The Government argues that information police received from a concerned citizen about the presence of suspicious strangers provided them with reasonable suspicion that the Defendant was "casing" an office in preparation for a burglary or robbery. [Doc. 22 at 1; Tr. 30]. The Government further argues that the Defendant was never "seized" within the meaning of the Fourth Amendment because he stopped the vehicle he was driving "voluntarily." [Tr. 23]. The Government also argues that even if the investigative stop of the Defendant was an unlawful seizure, the exclusionary rule should not operate to suppress the handgun that was discovered because the conduct of the police officer making the stop was not "so 'deliberate, reckless, or grossly negligent' that exclusion would meaningfully deter such conduct in the future." [Doc. 22 at 5 (quoting Herring v. United States, 129 S. Ct. 695, 702 (January 14, 2009))]. Finally, the Government argues that the Defendant lacks standing to challenge the

constitutionality of the discovery by police of an object laying on the ground in a public alley.[1]

The parties appeared before the undersigned for a hearing on the Defendant's motion on November 17, 2009. Assistant United States Attorney Cynthia Davidson was present representing the Government. Attorney Tollison represented the Defendant, who was also present. At the hearing, the Government called one witness. The Defendant did not present any evidence. At the conclusion of the hearing, Attorney Tollison requested additional time to file a supplemental memorandum relating to the issue of the Defendant's standing to challenge the constitutionality of police discovery of an object laying on the ground. The Court granted both parties until November 30, 2009 to file supplemental memoranda. The Defendant filed two post-hearing memoranda [Docs. 29 and 30]. The Government also filed two supplemental memoranda [Docs. 28 and 31]. The final supplemental memoranda from both parties were filed on November 30, 2009.

## I. FACTS

On July 13, 2009, at approximately 6:10 p.m., Officer Kim Barrington of the Dandridge Police Department observed a vehicle with expired license plate tags driving near the corner of Gay Street and Main Street in downtown Dandridge, TN. Officer Barrington pursued the vehicle and initiated a traffic stop on the shoulder of Main Street in front of the Dandridge Visitors Center. [Tr.

---

[1] The Government did not specifically raise the issue of the Defendant's lack of standing in its response [Doc. 22]. But the Government stated as follows while presenting its argument at the suppression hearing: "Even if [Officer Barrington] did look for the gun, where is [the Defendant's] standing to complain about a gun that was left out in the open? If you discard a gun, then it is not on you anymore." [Tr. 36]. In its post-hearing memoranda, the Government argues that "the Defendant does not have the necessary expectation of privacy in the gun or the area where it was found to challenge the constitutionality" of its discovery by Officer Barrington, [Doc. 28 at 5], and that "the Defendant has no standing to challenge the seizure of the evidence," [Doc. 28 at 5].

4].  Officer Barrington testified that as she parked her cruiser behind the stopped vehicle, she observed the Defendant sitting in a rocking chair on the porch of Maxwell House Unique Gift Emporium, a business adjacent to the Visitors Center.  [Tr. 4, 11-12].  Officer Barrington testified that shortly after she parked her cruiser–just when she "got out to approach the driver of the [stopped] vehicle"–the Defendant got up from the rocking chair and walked away.[2]  [Tr. 4].

When Officer Barrington exited her cruiser to approach the stopped vehicle, approximately two minutes after she pulled over to the shoulder, a local Dandridge attorney, Mr. P. Richard Talley, drove by the scene on Main Street.  [Tr. 19].  Mr. Talley stopped his car and spoke to Officer Barrington.  [Tr. 5].  Mr. Talley informed Officer Barrington that he was driving home from his law office and that he had just seen "a black male that he knew" behaving "suspiciously" in the area.  [Tr. 5, 11].  Mr. Talley told Officer Barrington that the police needed to "look out for this person."  [Tr. 5].  Mr. Talley also told Officer Barrington that he believed the individual was from Knoxville.  [Tr. 5].

After reporting his observation, Mr. Talley said goodbye to Officer Barrington and drove off down Main Street.  Officer Barrington proceeded with the business of the traffic stop, including writing a citation for driving with expired licence plate tags.  At some point during this process, Mr. Talley again drove by the scene on Main Street and stopped his car.  [Tr. 18].  Mr. Talley again spoke to Officer Barrington.  This time, Mr. Talley told Officer Barrington that he had seen *two*

---

[2] Officer Barrington stated that her attention was drawn to the fact that the Defendant left the rocking chair and did not stay to watch the traffic stop unfold because "human nature is for people to want to know what is going on."  [Tr. 5].  She stated that in her 21 years of experience, people "don't normally get up and walk away" when they have a ringside seat from which to "see if there is going to be some kind of action taking place."  [Tr. 12].  Officer Barrington said that the Defendant's decision to walk away "kind of alerted my suspicion that something was wrong."  [Tr. 5].

black males behaving suspiciously behind his office building, which is located adjacent to the Maxwell House and the Visitors Center. [Tr. 4-5, 11, 18]. Officer Barrington testified that "Mr. Talley came back by and said there were two black males in the area and they were hanging out around the rear of his building." [Tr. 5]. Officer Barrington further testified that Mr. Talley told her, "You need to find [them] and find out what they were doing in the area." [Tr. 17]. Mr. Talley then drove off. Officer Barrington testified that the duration of the traffic stop related to the expired tags was approximately 15 minutes. [Tr. 18]. Therefore, some period of time of less than 15 minutes elapsed between Officer Barrington's first and second conversations with Mr. Talley.[3]

As soon as Officer Barrington completed the traffic stop, she and another officer of the

---

[3] In its response [Doc.22] to the Defendant's amended motion to suppress evidence, the Government presents the following summary of Mr. Talley's conversation with Officer Barrington:

> "On July 13, 2009, a local Dandridge attorney, P. Richard Talley ("Talley"), stopped a Dandridge City Police Officer and told [her] that he saw two black males standing behind his law office and that he was made very uncomfortable by them. They were standing at a right angle from each other. Talley stated that he thought he recognized one of the black males to be the Defendant, Damien Elmore, a former client of his. Talley did not recognize the other individual. The individual Talley did not recognize walked up to him and asked him for a light. The individual then followed Talley to his car and asked him for a cigar. Talley pulled out of his parking lot and stopped Officer Kim Barrington to tell her that he was concerned about the two individuals that he thought were acting suspiciously behind his law office. He also told her that he thought they were from Knoxville." [Doc. 22 at 1].

However, the Government did not allege or prove these facts at the suppression hearing. Mr. Talley did not testify and the limited testimony provided by Officer Barrington was insufficient to establish the specific details alleged in the Government's response. The Court is careful to note that *only* the facts stated in section I of this report and recommendation were established by the evidence presented at the suppression hearing. Accordingly, the Court limits its analysis to only those facts and disregards any unsubstantiated allegations in the Government's response.

5

Dandridge Police Department began searching the immediate area around Mr. Talley's law office for the two "suspicious" individuals. [Tr. 6]. Officer Barrington and her colleague searched the area "for about 20 minutes." [Tr. 6, 13]. During the search, the officers entered Smoky's Steak and BBQ restaurant, the only business that was open in the vicinity. [Tr. 5-6]. Officer Barrington testified that the Defendant was not at Smoky's. [Tr. 6]. She also testified that the people inside Smoky's reported that they had not seen anyone who fit the Defendant's description come into the restaurant. [Tr. 6].

Officer Barrington concluded her search for the two individuals reported by Mr. Talley by driving to the parking lot behind Mr. Talley's law office. Officer Barrington testified that a "little alley" leads from Main Street to the parking lot.[4] [Tr. 6, 14]. She testified that the alley is wide enough to allow for two vehicles driving in opposite directions to pass each other. [Tr. 16, 19]. She also testified that the parking lot had approximately eight to ten parking spaces. [Tr. 14].

Officer Barrington turned off of Main Street and drove her cruiser into the alley heading towards the parking lot. In the alley, she encountered a "green Saturn" driven by the Defendant heading in the opposite direction–coming from the parking lot and heading towards Main Street. [Tr. 6]. Officer Barrington did not recognize the Defendant or the passenger in the vehicle, later identified as Calvino McAlister, as residents of Dandridge and she observed that both men were

---

[4] Officer Barrington testified during cross-examination that "the parking lot to me is adjacent to the alley which to me is part of the parking lot." [Tr. 14]. Officer Barrington followed up this testimony by agreeing with Attorney Tollison's statement that as soon as she pulled "off [Main Street]" she was "in the parking lot." [Tr. 14]. The Court is thus satisfied that, in the estimation of Officer Barrington, the investigative stop of the vehicle driven by the Defendant did not occur on a main public road.

6

black.[5]  [Tr. 13-15].  Officer Barrington stopped her cruiser and got out.  [Tr. 6].  She "advised" the Defendant to stop his vehicle.  [Tr. 6].  She stated that her cruiser and the vehicle driven by the Defendant were oriented "nose to nose, as far as vehicles go," but she noted that her cruiser was not directly in front of the Defendant's vehicle, blocking its path.  [Tr. 14-15].  Officer Barrington stated that there was enough space beside her cruiser to allow for the vehicle driven by the Defendant to drive by and continue out of the alley.  [Tr. 16].  Officer Barrington testified that she did not activate the emergency lights or the siren on her cruiser.  [Tr. 6-7].

Immediately after advising the Defendant to stop, Officer Barrington "had [the Defendant] exit the vehicle."  [Tr. 6].  The Defendant did so, and then Officer Barrington asked to see his driver's license.[6]  [Tr. 6].  The Defendant "advised" Officer Barrington that he did not have a driver's license.  [Tr. 6].  Officer Barrington conducted a records check and determined that the Defendant's driver's license had been suspended.  [Tr. 7].  Officer Barrington then walked around to the passenger's side of the vehicle and "asked the passenger," Mr. McAlister, "to open the door."  [Tr. 7].  Officer Barrington testified as follows about what occurred next:

> "When [Mr. McAlister] opened the door, I observed a holster in the door mat compartment.  I asked both [the Defendant and Mr. McAlister] if they knew what it was doing there.  They both advised it didn't belong to them.  As I removed Mr. McAlister from the vehicle, I looked down.  I observed a firearm laying underneath the vehicle on the right rear, underneath the right rear of the vehicle." [Tr. 7]

---

[5] Presumably, Officer Barrington recognized the Defendant from her earlier observation of him while he was seated in a rocking chair on the porch of Maxwell House.

[6] The Government incorrectly stated during its argument at the suppression hearing that Officer Barrington asked the Defendant for identification *before* she asked him to get out of the vehicle.  [Tr. 24].  Officer Barrington testified unequivocally that she first "had Mr. Elmore exit the vehicle" and only then asked him for his driver's licence.  [Tr. 6].

Both the Defendant and Mr. McAlister were placed under arrest. [Tr. 8]. The handgun was determined to be stolen. [Tr. 8]. Police subsequently searched the vehicle in which the Defendant and Mr. McAlister had been traveling and discovered several items, including the holster seen by Officer Barrington. Police also searched the Defendant and discovered what the Government describes as "a pillowcase with two eyes cut into it and a black sock" in his pockets. [Doc. 22 at 2].

## II. ANALYSIS

### A.      Seizure of the Defendant's person

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. A "seizure" of a person within the meaning of the Fourth Amendment occurs when a police officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968). "The test for the existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." California v. Hodari, D., 499 U.S. 621, 628 (1991). "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons," Terry, 392 U.S. at 20 n.16, but "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Id. at 16. In United States v. Mendenhall, 446 U.S. 544, 554 (1980), the Supreme Court established the definitive rule that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." The Supreme Court further clarified that "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence

8

of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554. The Supreme Court later added that the setting of an interaction between police and a citizen is another important factor "to consider in determining whether a reasonable person would feel free to leave." United States v. Buchanon, 72 F.3d 1217, 1225 (6th Cir. 1995) (citing Michigan v. Chesternut, 486 U.S. 567, 573 (1988)).

"The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the *driver* 'even though the purpose of the stop is limited and the resulting detention quite brief.'" Brendlin v. California, 551 U.S. 249, 255 (2007) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)) (emphasis added); United States v. Arvizu, 534 U.S. 266, 273 (2002) ("The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."); Buchanon, 72 F.3d at 1225 (stating that a detention does not "need to be long lived to be a seizure" and "an unconstitutional seizure can occur even if the police detain a person only momentarily"); Whren v. United States, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period of time and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the [Fourth Amendment]."). In Brendlin, the Supreme Court squarely held that "during a traffic stop, an officer seizes everyone in the vehicle, not just the driver." 551 U.S. at 255; see Colorado v. Bannister, 449 U.S. 1, 4 n.3 (1980) ("There can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment."). The Supreme Court recently reconfirmed in Arizona v. Johnson, 129 S. Ct. 781, 783 (January 26, 2009) (citing Brendlin, 551

U.S. at 257), that "a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will." Accordingly, the Supreme Court held that "a passenger is seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.'" Id. at 786 (quoting Brendlin, 551 U.S. at 263).

In this case, the Court finds that Officer Barrington seized both the Defendant and Mr. McAlister. This seizure occurred, at the earliest, when Officer Barrington "advised" the Defendant to stop the vehicle that they were traveling in, or at the latest, when Officer Barrington "had [Defendant Elmore] exit the vehicle." The Court acknowledges that the investigative stop of the Defendant's vehicle was different from what is traditionally thought of as a "traffic stop." Officer Barrington did not activate the siren and lights on her cruiser and she did not pursue the vehicle until the Defendant pulled over out of the stream of traffic on a highway or main road. Instead, Officer Barrington encountered the vehicle in an alley connecting a small parking lot to Main Street. There was no evidence offered on specifically how Officer Barrington "advised" the Defendant to stop his vehicle. Officer Barrington was asked about this at the suppression hearing, but her response was merely a denial of the use of lights and siren.[7] There was also no evidence presented at the

---

[7] Direct examination of Officer Barrington proceeded as follows:

Q:      Then what happened?

A:      I advised them to stop. I got out of the vehicle. I had Mr.
        Elmore exit the vehicle. I asked him for his driver's
license.         He advised me he did not have a driver's license.

Q:      Okay. When you advised them to stop, how did you get
them     stopped? Did you initiate lights and sirens?

10

suppression hearing that established whether the alleyway where the stop occurred was public or private property. Nor was evidence offered to prove whether the parking lot itself was open for use by members of the public or strictly private property.

The Court notes that although there is a factual difference between the traditional notion of a traffic stop and the investigative stop that occurred in this case, it is a difference that does not give rise to a legal distinction when analyzing the two situations to determine if a Fourth Amendment seizure occurred. In this case, the Court finds that Officer Barrington unequivocally made some "show of authority" that compelled the Defendant to stop the vehicle he was driving and then exit that vehicle. See Terry, 392 U.S. at 20 n.16. Based on Officer Barrington's words and actions, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." See Mendenhall, 446 U.S. at 554. The Government offered no evidence at the suppression hearing to support its contrary allegation that the Defendant stopped "voluntarily." Because this allegation is unsubstantiated by the proof, it is rejected by the Court. The proof indicates that the Defendant stopped the vehicle he was driving because Officer Barrington "advised" him to do so. Accordingly, the Court concludes that Officer Barrington's investigative stop amounted to a Fourth Amendment seizure of both the Defendant and Mr. McAlister.

---

A:      No. As they were pulling out of the driveway, I was pulling        in. We were almost like facing each other.

Q:      Okay.

A:      I did not use lights, no.

[Tr. 6-7].

11

12

**B.      Reasonable suspicion to justify the seizure**

The seizure of a person that occurs during an investigative stop of a vehicle comports with the Fourth Amendment only if the police have a reasonable suspicion that "criminal activity may be afoot" to justify the stop. <u>Terry</u>, 392 U.S. at 30; <u>Arvizu</u>, 534 U.S. at 273 ("the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot"). A police officer's suspicion that criminal activity may be afoot is reasonable and thus justifies an investigative stop only when the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion upon the stopped person's privacy. <u>Terry</u>, 392 U.S. at 21. The Supreme Court expounded on the definition of "reasonable suspicion" in <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981) (internal citations omitted):

> "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of a vehicle. An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity....the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.
>
> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person....
>
> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular

13

individual being stopped is engaged in wrongdoing."

The Court of Appeals for the Sixth Circuit has instructed that courts applying the <u>Cortez</u> test for reasonable suspicion must be cautious about attaching significance to a person's "innocuous behavior" or "purely innocent activity." <u>United States v. Patterson</u>, 340 F.3d 368, 371 (6th Cir. 2003). The Court of Appeals addressed "innocent activity" in the context of a reasonable suspicion analysis in <u>United States v. Smith</u>, 263 F.3d 571, 593-94 (6th Cir. 2001) (internal citations omitted):

> "This Court is aware that under the totality of the circumstances test it is possible that 'objective facts, meaningless to the untrained' can provide the basis for reasonable suspicion. However, some factors may be 'outrightly dismissed,' because they are 'so innocent or susceptible to varying interpretations as to be innocuous.'... It is possible for factors, although insufficient individually, to add up to a reasonable suspicion–that is the nature of the totality of the circumstances test. But we think it impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."

The Court of Appeals quite simply restated the need for caution in <u>Patterson</u>: "Walking in the opposite direction from the police could be considered an indication of a person's fear of being caught participating in illegal activities, but it could also be purely innocent activity." 340 F.3d at 371. The <u>Patterson</u> court went on to hold that the fact that the defendant, who was standing among a group of at least eight men on a street corner known to police as a "hot spot" of criminal activity, walked "away from the police when they got out of their unmarked car constitutes a factor to be outrightly dismissed" as having no significance to the analysis of whether the police had reasonable suspicion to detain him. <u>Id.</u> at 372.

In this case, the Government argues that Officer Barrington had a reasonable suspicion that the Defendant and Mr. McAlister were in the process of "casing" Mr. Talley's office in preparation to burglarize it or to rob Mr. Talley himself. [Tr. 30]. The Government argues that the following

14

facts, and "objective manifestations" by the Defendant, reasonably warranted Officer Barrington's investigative stop of the vehicle driven by the Defendant:

> (1) the Defendant was observed by Officer Barrington getting up from where he was seated in a rocking chair on the porch of the Maxwell House and walking away, despite the fact that his position in the chair gave him a ringside seat from which to observe the traffic stop that Officer Barrington was conducting [Tr. 4-5, 12];

> (2) Officer Barrington did not recognize the Defendant or Mr. McAlister as residents of Dandridge [Tr. 13-15];

> (3) Mr. Talley informed Officer Barrington that he had seen two black males, one of whom was known to him and known to be from Knoxville, behaving "suspiciously" in the area around his law office building, and specifically in the area behind the building[8] [Tr. 4-5, 11, 17-19];

> (4) at the time of the investigative stop of the vehicle driven by the Defendant, only one business in the immediate vicinity surrounding Mr. Talley's law office, Smoky's BBQ, was open [Tr. 5-6];

> (5) Officer Barrington observed that the Defendant was not at Smoky's and was told by people inside of Smoky's that the Defendant had not come in [Tr. 6]; and

> (6) Officer Barrington encountered a green Saturn driven by the Defendant–in which another black male, later identified as Mr. McAlister, was riding in the passenger seat–heading down the alleyway from the small parking lot behind Mr. Talley's office towards Main Street [Tr. 6].

No other specific facts were articulated at the suppression hearing as a basis for Officer Barrington's purportedly reasonable suspicion. The Government relies on the six facts listed above–and only

---

[8] Again, the Court notes that the Government *alleges* that Mr. Talley communicated additional information beyond what is listed here during the course of two conversations with Officer Barrington. However, the Government did not *prove*–indeed it offered no evidence that even tended to prove–that Mr. Talley provided Officer Barrington with any information other than that summarized by the Court as Fact 3.

those six facts–to argue that the Defendant and Mr. McAlister were "obviously" casing Mr. Talley's law office. [Tr. 30]. The Court rejects the Government's argument.

First, under the doctrine of <u>Smith</u> and <u>Patterson</u>, Fact 1 on the above list cannot be considered as a factor that supports reasonable suspicion. Fact 1 must be "outrightly dismissed" as having no significance to the proper formation of reasonable suspicion because it is nothing more than an observation of behavior that is "so innocent or susceptible to varying interpretations as to be innocuous." <u>See</u> <u>Smith</u>, 263 F.3d at 593-94. In <u>Patterson</u>, the Court of Appeals for the Sixth Circuit "outrightly dismissed" as having no significance to the analysis of whether police had reasonable suspicion to detain a man the fact that the man walked away when police approached to question him and other people. 340 F.3d at 371. Based on <u>Patterson</u>, the Court is convinced that the fact that the Defendant in this case walked away from where he was seated while a police officer was conducting a routine traffic stop of someone else's vehicle within his field of view must be outrightly dismissed as insignificant.

In <u>Patterson</u>, the police were approaching the defendant to question him when he walked away. <u>Id.</u> In this case, Officer Barrington did not approach the Defendant, did not speak to the Defendant, and had no intention to speak to or approach the Defendant when he walked away. Officer Barrington was occupied instead with the business of the traffic stop. In <u>Patterson</u>, the police arrived at the location where they saw the defendant because they had received an anonymous tip that criminal activity was in progress at that location. <u>Id.</u> Officer Barrington arrived at the location on Main Street from where she could see the Defendant in a rocking chair only because she happened to make a traffic stop there–a traffic stop that was in no way connected to the Defendant or to *any* broader criminal activity. In <u>Patterson</u>, the location where the defendant was seen by

16

police was known to them as a "hot spot" of criminal activity.  Id.  The location where Officer Barrington observed the Defendant sitting was not even alleged to be a hot spot of criminal activity.

The Court is careful not to perfunctorily dismiss Officer Barrington's suspicion of the Defendant's act of walking away from her as insignificant.  See note 2, *supra*.  The Court recognizes that "the awareness of something unusual is reason enough for officers to look sharp" and that "their knowledge and experience identify many incidents in the course of a day that an untrained eye might pass without any suspicion whatever."  United States v. Montgonery, 561 F.2d 875, 879 (D.C. Cir. 1977).  "But awareness of the unusual, and a proper resolve to keep a sharp eye," id., is quite different from fixating upon conduct that is so "susceptible to varying interpretations as to be innocuous" and using that conduct as a building block in the construction of purportedly reasonable suspicion that criminal activity is afoot.  See Smith, 263 F.3d at 593-94.  The Court concludes that Fact 1 has no significance in the analysis of whether Officer Barrington had reasonable suspicion to justify stopping the Defendant in this case.

Turning to Facts 2-6, the Court finds that, taken together, they were insufficient to form the "particularized and objective basis" for suspecting the Defendant or Mr. McAlister of criminal activity that was required to justify an investigative stop of the vehicle in which they were traveling.  See Cortez, 449 U.S. at 417-18.  Facts 2-6 did not cast any *particularized* suspicion on either the Defendant or Mr. McAlister.[9]  Officer Barrington's testimony at the suppression hearing established

_____

[9] The Court notes that Facts 2-6 do not reasonably support *any* suspicion at all, let alone a particularized suspicion.  Even after considering all of the facts and viewing the totality of the circumstances, there does not appear to be any reasonable basis for suspecting that *any* criminal activity was afoot in the area of downtown Dandridge around Mr. Talley's office.  Officer Barrington testified that she and a colleague searched and investigated the vicinity "for about 20

that Mr. Talley alerted her to the presence of two black men, one of whom he recognized and knew to be from Knoxville, who were behaving suspiciously in the area around his office. The Government failed to prove that Mr. Talley provided any *particularized* description of either "suspicious" man to Officer Barrington. Thus, the *only* descriptive information known to Officer Barrington was that the suspicious individuals she was looking for were male and black. She also knew that one of the individuals was known to Mr. Talley and that the other was unknown to Mr. Talley. Further, Officer Barrington's testimony at the suppression hearing did not establish that she suspected or had a reason to suspect any *particular* criminal activity. Such completely unparticularized suspicion–with regard to both description of the suspected perpetrators and the type of criminal activity suspected–does not even rise to the level of a "hunch."

It appears to the Court that Officer Barrington acted upon the information she received from Mr. Talley by simply stopping the first two black men she encountered who she didn't know to be from Dandridge. At best, Officer Barrington acted on her suspicion of a suspicion–she simply suspected that the Defendant and Mr. McAlister were the two "suspicious" black men reported by Mr. Talley. It should take more than a citizen's claim that two black men are "behaving suspiciously" to form the reasonable suspicion needed to justify a <u>Terry</u> stop of any particular pair of black men driving together in a vehicle.

If the approach to investigating citizen tips taken by Officer Barrington in this case "became

---

minutes," [Tr. 6, 13], before the stop of the Defendant and found nothing amiss. There was no reasonable basis for Officer Barrington to believe or suspect that any criminal or sinister activity had occurred or was going to occur, let alone any such activity involving the Defendant or Mr. McAlister. There was no evidence of the perpetration of a recent crime, no evidence of any present criminal activity, and no evidence of a likelihood of future criminal activity occurring. There was quite simply no evidence of actual or suspected criminal activity to investigate at the time the Defendant and Mr. McAlister were stopped.

prevalent among law enforcement officers across the nation," many black men "would be subject to virtually random seizures regardless of innocence or guilt." United States v. Grant, 920 F.2d 376, 388 (6th Cir. 1990). The Court finds that Officer Barrington did not have a reasonable suspicion that either the Defendant or Mr. McAlister was, or was about to be, engaged in criminal activity. Accordingly, the Court finds that Officer Barrington's seizure of the Defendant and Mr. McAlister was unjustified and violated their Fourth Amendment rights.

### C. The applicability of the exclusionary rule

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); Wong Sun v. United States, 371 U.S. 471, 485 (1963) ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion."); Mapp v. Ohio, 367 U.S. 643, 654 (1961) ("all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383 (1914) (establishing the exclusionary rule). However, the Supreme Court has stated that "as with any remedial device the application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." Segura v. United States, 468 U.S. 796, 804 (1984); United States v. Janis, 428 U.S. 433, 454 (1976) (if "the exclusionary rule does not result in appreciable deterrence, then clearly, its use...is unwarranted"). Recently, the Supreme Court reaffirmed this limiting principle in Herring v. United States, 129 S. Ct. 695 (January 14, 2009). The Supreme Court stated in Herring that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently

19

culpable that such deterrence is worth the price paid by the justice system." 129 S. Ct. at 702. The Supreme Court concluded that the exclusionary rule should operate only "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Id.

In this case, the Government relies on Herring to summarily argue that "suppression is inappropriate." [Doc. 22 at 5]. The Court discerns the Government's argument to be that the violation of the Defendant's Fourth Amendment rights discussed *supra* in part B does not rise to the level of the violations described in Herring that necessitate application of the exclusionary rule. The Court finds this argument to be unpersuasive. The conduct of the police in this case was certainly deliberate. Officer Barrington and her colleague searched downtown Dandridge for 20 minutes for two black males who were accused by a third person of simply being "suspicious." Officer Barrington then seized the first two black males that she encountered who she believed were not from Dandridge. The Court believes that this type of police conduct *is* both culpable and appreciably responsive to the deterrent effect of the exclusionary rule. See Herring, 129 S. Ct. at 702; Buchanon, 72 F.3d at 1228 ("If law enforcement officers are permitted to illegally seize persons in order to attempt to uncover evidence of criminal conduct, then the Fourth Amendment right of persons in this country to go about their business free from baseless interference from the police has been extinguished."). Accordingly, the Court finds that evidence in this case that was derived from or obtained as a direct result of the unlawful seizure of Defendant Elmore, Mr. McAlister, and the vehicle in which they were traveling should be suppressed as inadmissible. Thus, all evidence recovered from the persons of Defendant Elmore and Mr. McAlister and all evidence recovered from inside of the vehicle should be suppressed.

The question left for the Court is whether the handgun discovered by Officer Barrington *outside* of the vehicle–specifically, on the ground beneath the vehicle–driven by the Defendant should be suppressed due to having been derived from or obtained as a result of the unlawful seizure.

When the exclusionary rule operates to suppress evidence, "[t]he scope of evidence to be excluded sweeps broadly, including both '[e]vidence obtained as a direct result of an unconstitutional search or seizure,' as well as evidence that is considered the 'fruit of a prior illegality' that was 'come at by exploitation of [the initial] illegality." Dice, 200 F.3d at 983 (quoting Segura, 468 U.S. at 804); see Nardone v. United States, 308 U.S. 338, 341 (1939) (first employing the now ubiquitous phrase "fruit of the poisonous tree" to describe evidence derived from an unlawful search and seizure); Murray v. United States, 487 U.S. 533, 536-37 (1988) (stating that the fruit of the poisonous tree doctrine "bars evidence which, though not obtained in [an] illegal search, was *derived from* information or items obtained in the search") (emphasis added). The Supreme Court has stopped short of establishing a bright line rule that "evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Wong Sun, 371 U.S. at 488; Hudson v. Michigan, 547 U.S. 586, 592 (2006) ("but-for causality is only a necessary, not sufficient, condition for suppression"); Segura, 468 U.S. at 815 (stating that the Supreme Court has "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police'"). In other words, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." Hudson, 547 U.S. at 592. Instead, evidence is considered fruit of the poisonous tree that must be suppressed only when it was "come at by exploitation of the primary

illegality" committed by police. <u>Wong Sun</u>, 371 U.S. at 488. Evidence is *not* fruit of the poisonous

tree, and thus should not be suppressed, when the connection between its discovery and the "lawless

conduct of the police" is "so attenuated as to dissipate the taint." <u>Id.</u> (quoting <u>Nardone</u>, 308 U.S.

at 341). "Dissipation of the taint resulting from an [illegality] ordinarily involves showing that there

was some significant intervening time, space or event." <u>United States v. Buchanan</u>, 904 F.2d 349,

356 (6th Cir. 1990) (citing <u>United States v. Vasquez</u>, 638 F.2d 507, 528 (2d Cir. 1980)). In other

words, evidence should not be suppressed if it was obtained by the police "by means sufficiently

distinguishable" from their unlawful conduct.[10]    <u>Wong Sun</u>, 371 U.S. at 488.

Importantly, the concept of attenuation–or "dissipation"– of the connection between unlawful

conduct and the discovery of evidence is broader than the concept of simple causal remoteness. The

Supreme Court explained the full breadth of the attenuation doctrine in <u>Hudson v. Michigan</u> as

follows:

> "Attenuation can occur, of course, when the causal connection [between the lawless conduct of the police and the discovery of evidence] is remote. Attenuation also occurs when, given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained. 'The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve.'" 547 U.S. at 593 (quoting <u>United States v. Ceccolini</u>, 435 U.S. 268, 279 (1978)).

In <u>Hudson</u>, the Supreme Court went on to hold that the exclusionary rule did not operate to suppress

---

[10] The Government bears the burden of proving that the discovery of evidence is sufficiently attenuated from unlawful police conduct. <u>United States v. Shaw</u>, 464 F.3d 615, 626 (6th Cir. 2006) ("demonstrating such 'purgation' is, of course, a function of circumstantial evidence, with the burden of persuasion on the State") (citing <u>Brown v. Illinois</u>, 422 U.S. 590, 604 (1975)).

evidence obtained by police during the search of a home that was authorized by a warrant but was initiated by officers who failed to adhere to the "knock-and-announce" rule. Id. at 594. The Supreme Court found that, although the *causal* connection between the Fourth Amendment violation arising from the failure knock-and-announce and the discovery of evidence was unattenuated, the *overall* connection between the violation and the discovery *was* attenuated in the sense that discovery of the evidence did not impinge upon any rights that the knock-and-announce rule was intended to protect. Id. In other words, the connection between the discovery itself and the failure to knock-and-announce was attenuated because "the interests that were violated" by that failure had nothing to do with the discovery of evidence. Id. The Supreme Court stated that "the interests protected by the knock-and-announce requirement are quite different [from those protected by the search warrant requirement]–and do not include the shielding of potential evidence from the Government's eyes." Id. at 593.[11] Accordingly, the Supreme Court held that, though causally linked, a failure by police to knock-and-announce and the subsequent search of a residence pursuant to a valid warrant have a connection that is attenuated to the degree that the failure does not taint the evidence uncovered during the search.

The Court of Appeals for the Sixth Circuit has considered the degree to which the connection between discovery of evidence and an unlawful seizure of a person becomes attenuated in several contexts. First, in United States v. Buchanon, 72 F.3d at 1226, the Court of Appeals held that "when

---

[11] The interests protected by the knock-and-announce rule are (1) "the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident"; (2) "the protection of property"; and (3) protection of "those elements of privacy and dignity that can be destroyed by a sudden entrance." Hudson, 547 U.S. at 594. "What the knock-and-announce rule has never protected, however, is one's interest in preventing the Government from seeing or taking evidence described in a warrant." Id.

a canine narcotics sniff is performed as the result of the exploitation of a primary illegality, the fruits of that canine sniff must be suppressed." In Buchanon, the "primary illegality" was the seizure of the defendant that occurred when a police officer asked him to move away from his parked vehicle to allow another officer to conduct a canine sniff of the vehicle. 72 F.3d at 1225. The Court of Appeals concluded that, although a canine sniff of "an unattended vehicle or unattended personal property" or of "legally seized personal property pursuant to a legal seizure of a person" is not unconstitutional, a sniff "made possible by an unconstitutional Terry seizure violates the Fourth Amendment," is "unconscionable," and requires the suppression of any contraband it uncovers. Id. at 1228.

Second, in United States v. Richardson, 949 F.2d 851, 858-59 (6th Cir. 1991), the Court of Appeals held that the defendant's consent to a search of his vehicle and storage shed was invalid because it was "not sufficiently attenuated from" the "taint caused by [his] illegal arrest." The court stated, "we do not believe that the taint had dissipated after merely twenty minutes of continued improper conduct." Id. at 859. Accordingly, the court held that "the taint of the illegal arrest vitiated [the defendant]'s consent" and that "the immediate fruits of the consent should have been suppressed." Id. Thus, any evidence obtained from within the vehicle or shed was inadmissible. Id.

Third, in United States v. Grant, 920 F.2d 376, 388 (6th Cir. 1990), the Court of Appeals held that the defendant's consent to a search of his carry-on luggage was invalid because it was not sufficiently attenuated from the unlawful seizure of his person. The Court concluded that the defendant's "subsequent consent to the search of his carry-on bag did not overcome the taint of the agent's prior conduct." Id. at 388. Accordingly, the court held that all of the evidence discovered

in the defendant's carry-on bag should have been suppressed.  Id. at 389.

The Court recognizes that this case is distinct from Buchanon, Richardson, and Grant in two important respects.[12]  First, in each of those cases, the police unlawfully seized the defendant and afterwards took some additional *active* steps to discover evidence of criminal activity.  In Buchanon, the police conducted a canine sniff of the defendant's vehicle.  In Richardson, the police waited twenty minutes, asked the defendant if they could search his car and storage shed, and then searched them.  In Grant, the police asked the defendant if they could search his carry-on bag and then did so.  In all three cases, the additional active steps taken by the police culminated in a search of objects or locations that were under the defendant's control.  In this case, although Officer Barrington unlawfully seized Defendant Elmore, Mr. McAlister, and the vehicle in which they were traveling, she did not subsequently take any additional *active* steps to discover evidence.  Officer Barrington discovered the handgun at issue in this case through *passive* observation of the ground during the unlawful seizure of the Defendant.  The handgun was not found during a search of an object or location that was within the Defendant's control.  Officer Barrington testified as follows:

> "As I removed Mr. McAlister from the vehicle, I looked down.  I observed a firearm laying underneath the vehicle on the right rear, underneath the right rear of the vehicle."  [Tr. 7].

Officer Barrington also discovered a holster during the unlawful seizure.  The holster was not found during a search, but was observed by Officer Barrington when she opened the front passenger side door.  She testified as follows:  "I asked the passenger to open the door.  When he

---

[12] The Court of Appeals for the Sixth Circuit has applied the attenuation doctrine in several other cases involving unlawful seizure of a person beyond the three summarized *supra* in this report and recommendation.  See, e.g., Northrop v. Trippett, 265 F.3d 372 (6th Cir. 2001); United States v. Caicedo, 85 F.3d 1184 (6th Cir. 1996).  This Court is satisfied that Buchanon, Richardson, and Grant are adequately illustrative.

opened the door, I observed a holster in the door mat compartment." [Tr. 7]. Thus, in contrast to the handgun, the holster *was* discovered in a location within the Defendant's control–*inside* of the vehicle.

The second important distinction between this case and the trinity of <u>Buchanon</u>, <u>Richardson</u>, and <u>Grant</u> arises from the fact that, in this case, the firearm the Defendant seeks to suppress was discovered laying on the ground in an alleyway connecting a public street to a parking lot and *not* inside of a vehicle or container in which the Defendant had a privacy, possessory, or ownership interest. In <u>Buchanon</u>, police discovered evidence inside the defendant's vehicle. In <u>Richardson</u>, police discovered evidence inside the defendant's truck and storage locker. In <u>Grant</u>, the evidence was discovered inside the defendant's hand luggage. In all three cases, the defendants unequivocally had constitutionally protected privacy interests in the objects and locations that were searched by the police. In this case, no evidence was presented at the suppression hearing to establish whether the Defendant or Mr. McAlister asserted or denied an ownership interest in the handgun. Presumably both men either denied ownership or remained silent. There was also no evidence presented indicating that the Defendant had any constitutionally protected privacy or possessory interest in the handgun itself, and it is clear that he had no privacy interest in the alleyway.

The Court finds that, "but for" the unlawful investigative stop of the Defendant, police would not have discovered the handgun at issue in this case when they did. Officer Barrington's sole reason for going to the alleyway was to search for two suspicious black men and her sole reason for getting out of her cruiser and approaching the spot where she found the gun was to conduct an unlawful investigative stop.

Thus, "but for" the unlawful stop, Officer Barrington would not have seen the handgun or

holster when she did. Under <u>Wong Sun</u>, a finding that unlawful conduct by the police was the "but for" cause of discovery of evidence is not, by itself, enough to warrant suppression. <u>See</u> 371 U.S. at 488. Accordingly, the question for the Court to decide is whether Officer Barrington's passive observation of the holster inside the Defendant's stopped vehicle and the gun laying on the ground beneath the vehicle were "come at by exploitation of" the execution of the unlawful investigative stop. <u>See</u> <u>id.</u>

It is clear that in terms of temporal and spatial proximity, Officer Barrington's discovery of both the handgun and the holster was not remote from her unlawful conduct in making the investigative stop. However, the Court finds that the handgun was not "come at by exploitation of" the stop. <u>See</u> <u>Wong Sun</u>, 371 U.S. at 488. At most, Officer Barrington "exploited" the unlawful stop to acquire a vantage point that allowed her to passively observe the ground under the Defendant's vehicle. She discovered the handgun by simply spotting it laying on the ground. At the time she spotted the gun, Officer Barrington had taken no active steps towards discovering evidence of criminal activity beyond stopping the vehicle, commanding the Defendant to get out of the vehicle, asking the Defendant for identification, and "removing" Mr. McAlister from the vehicle. In short, Officer Barrington had taken no additional action beyond the unlawful seizure itself. There was no testimony at the suppression hearing that established that Officer Barrington actively looked for a handgun or for any other evidence of criminal activity. Officer Barrington's sighting of the handgun was contemporaneous with, but not resultant from, her unlawful seizure of the Defendant. In other words, the handgun was not "derived from" the unlawful seizure. <u>See</u> <u>Murray</u>, 487 U.S. at 536-37. Accordingly, the Court finds that Officer Barrington's observation of the handgun was not tainted by her unlawful conduct. The Court concludes that the handgun is not

the fruit of the poisonous tree and therefore not subject to suppression.[13] However, the Court

concludes that Officer Barrington's observation of the holster was tainted by her unlawful conduct.

_____

[13] The Court of Appeals for the Sixth Circuit provided somewhat instructive dicta in United States v. Pearce, 531 F.3d 374, 383 n.2 (6th Cir. 2008). In Pearce, a police officer conducting a crime detection sweep in a high-crime area lawfully seized the defendant just after he exited a vehicle. Id. at 378. The officer conducted a pat-down of the defendant and "recovered nine small plastic bags of marijuana." Id. As the officer was conducting the pat-down, a second officer participating in the sweep walked towards the vehicle from which the defendant had exited. Id. The second officer looked through the passenger side window of the vehicle and "saw a magazine or the clip from a gun laying on the passenger floorboard in plain view." Id. The second officer then searched the vehicle and discovered firearms inside. Id. In a footnote, the Court of Appeals briefly considered whether the firearms discovered inside the vehicle would have been "fruit of the poisonous tree" if the first officer's seizure of the defendant had been unlawful. 531 F.3d at 383 n.2. The Court stated as follows:

> "While it might be argued that [the second officer] would never
> have looked in the [vehicle] but for [the first officer]'s stop of the
> defendant, such but-for causality is not sufficient to trigger the
> exclusionary rule. On the contrary, [the second officer]'s
> observation of the gun magazine as he walked by the
> [vehicle]–something which he arguably would have done anyway,
> as part of his sweep of the area, regardless of [the first officer]'s
> stop of [the defendant]–seems to constitute a means of discovery
> 'sufficiently distinguishable to be purged of the primary taint' of
> [the first officer]'s allegedly illegal stop." Id. (internal citations
> omitted).

In this case, Officer Barrington would have seen the handgun laying on the ground regardless of whether her seizure of the Defendant was lawful or unlawful. She testified that she was not actively looking for a gun and that she just happened to spot it. Further, because the handgun was observed in plain view on the ground outside of the car rather than in plain view inside of the Defendant's vehicle, the argument that police would have discovered it regardless of the legality of the challenged seizure is even stronger than that articulated in Pearce. The Court recognizes, of course, that Officer Barrington may never have seen the handgun if she had not stopped the vehicle driven by the Defendant at all–lawfully or unlawfully. But speculating about whether Officer Barrington would have seen the gun without making the stop requires speculating about when and how the gun came to be laying on the ground, and the Court declines to so. Although the Government asserts that "the evidence in this case is that the gun was abandoned immediately prior to the police contact," [Doc. 31 at 1], there was in fact no direct evidence presented at the suppression hearing that established when the gun came to be laying on the ground or that it was "abandoned" from within the vehicle driven by the Defendant.

28

Accordingly, the holster is the fruit of the poisonous tree and should be suppressed.

The Court's conclusions are supported by an analysis of the facts of this case under the rule of Hudson. The Supreme Court explained in Hudson that the concept of attenuation was not limited simply to causal attenuation. See 547 U.S. at 593. "Attenuation also occurs when, given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." Id. The Terry requirement that police must have reasonable suspicion to justify an investigative vehicle stop is intended to protect both an individual's "Fourth Amendment right...to go about [his] business free from baseless interference from the police," Buchanon, 72 F.3d at 1228, and his right to privacy in his person, effects, and vehicle.

In this case, the connection between Officer Barrington's observation of the handgun on the ground and her Terry violation was attenuated because her ability to see the gun did not impinge upon any rights that Terry and its progeny were intended to protect. However, Officer Barrington's ability to see the holster resulted only from her instruction to Mr. McAlister to exit the vehicle during the unlawful investigative stop and seizure.

Suppression of a handgun that was spotted laying on the ground would not serve to protect the Defendant's interest in his personal privacy because Officer Barrington did not have to intrude on his privacy in order to see the gun. However, suppression of the holster, which was spotted *inside* of the vehicle, would serve to protect the Defendant's interest in privacy.

Suppression of the handgun also would not serve the Defendant's interest in going about his business freely because, again, Officer Barrington did not have to intrude on this interest in order to see the handgun. In other words, Officer Barrington would have spotted a handgun lying on the

29

ground in the alleyway regardless of whether her basis for stopping the Defendant's vehicle was lawful or unlawful. Officer Barrington *did*, however, have to intrude upon the Defendant's interest in freely going about his business in order to see the holster. Thus, under <u>Hudson</u>, suppression of the handgun discovered by Officer Barrington is inappropriate, but suppression of the holster is appropriate.

The Court does note that there are cases that hold that evidence discarded or purposefully abandoned by a defendant *during* or immediately *after* an unlawful seizure may be subject to suppression if the defendant's action was "precipitated by" the seizure.[14] There are also cases that hold that evidence purposefully abandoned, discarded, or even inadvertently dropped by a defendant immediately *before* an unlawful seizure are not subject to suppression because the defendant's action was *not* precipitated by the seizure.[15] In this case, the timing of any abandonment, purposeful

---

[14] In its memorandum, the Government itself recognizes that "[w]hen it is determined that the alleged relinquishment of property at issue occurred *after* an illegal search or seizure of a person, the individual's actions in response to the illegal search and seizure cannot be deemed to be an abandonment of the illegally obtained property so as to purge the taint from the unlawful police conduct." [Doc. 31 at 3] (emphasis added). <u>See</u> <u>United States v. Coggins</u>, 986 F.2d 651, 653 (3rd Cir. 1993) ("when the abandonment of property is precipitated by an unlawful seizure, that property also must be excluded"); <u>United States v. Wilson</u>, 953 F.2d 116, 127 (4th Cir. 1991) (holding that because the defendant's purported abandonment of a coat during flight from the police occurred *after* he had been illegally seized, this action was clearly the direct result of the illegal seizure; thus, drugs discovered inside the coat were the fruit of the illegality and were suppressed); <u>United States v. Beck</u>, 602 F.2d. 726, 730 (5th Cir. 1979) (holding that "it would be sheer fiction to presume that" the act of tossing a marijuana cigarette out of a car window after the commencement of an illegal traffic stop was "caused by anything other than the traffic stop"; thus, the cigarette was "tainted by the illegal stop" and suppressed); <u>United States v. Ward</u>, 961 F. 2d 1526, 1535 (10th Cir. 1992) ("abandonment will not be recognized when it is the result of illegal police conduct").

[15] The Government correctly states that "a defendant who, *immediately prior to* a police encounter, throws away [an object] containing incriminating evidence has no reasonable expectation of privacy in [that] object after it has been thrown away, and [therefore] the Fourth Amendment offers no bar to its seizure." [Doc. 31 at 2] (emphasis added) (citing <u>United States</u>

30

discard, or inadvertent dropping of the handgun–if it occurred at all–was not proved at the suppression hearing and any finding by the Court on this point would be nothing short of speculation.[16] In this case, as pointed out in note 13, *supra*, there was no direct evidence presented at the suppression hearing about when and how the gun came to be laying on the ground.[17] Instead, there is *only* circumstantial evidence that indicates that the handgun was previously located inside the vehicle driven by the Defendant. Thus, the Court cannot find, as the Government would like it to, that the Defendant voluntarily abandoned the gun "immediately prior" to being stopped and seized by Officer Barrington, [Doc. 31 at 1], or "prior to any interaction with the Dandridge

---

v. Dillard, 78 Fed. App'x 505, 509 (6th Cir. 2003)).

[16] In every case that the Court has found in which an object picked up by police from off of the ground was suppressed, there was at least *some* evidence that *directly* indicated previous possession of that object by the defendant. See, e.g., Beck, 602 F.2d at 727 (a police officer testified that he thought he saw a marijuana cigarette that he recovered from the ground next to a vehicle in which the defendant was seated in the driver's seat come out of the driver's window of that vehicle); United States v. Eaglin, 759 F. Supp.2d 25, 26 (D.D.C. 1991) (a police officer testified that he observed the defendant reach into his pants pocket and throw a clear plastic bag containing narcotics into the air); United States v. Simpson, 944 F.Supp. 1396, 1402-3 (S.D.Ind. 1996) (a police officer and the defendant both testified that the defendant threw a package containing cocaine from the third-floor landing of his apartment after hearing police officers opening the door to the apartment); Fletcher v. Wainwright, 399 F.2d 62, 63 (5th Cir. 1968) (the court accepted as an established fact that stolen jewelry discovered on the ground behind the defendant's hotel room "had been thrown out the window [of the room] when [an] officer began kicking down the door" to the room); Wilson, 953 F.2d at 118-119 (it was undisputed that the defendant was carrying and then threw aside a coat containing cocaine base that was recovered from the ground by police); United States v. King, 990 F.2d 1552, 1555 (10th Cir. 1993) (two bystanders reported to police that they observed the defendant remove a bag containing drugs from her pants and drop it on the ground after she had been unlawfully detained).

[17] The Government essentially concedes this in its memoranda, stating:

> "It is unclear exactly when the gun was discarded and even if it belongs to the Defendant." [Doc. 28 at 5].

Police Department," [Doc. 28 at 5]. The Court simply cannot determine from the paucity of facts established at the suppression hearing if the handgun was abandoned at all, either before or after the unlawful seizure.

The Court is careful to point out that its conclusion that the handgun should not be suppressed is based on its findings that (1) no evidence whatsoever was presented at the suppression hearing about when and how the gun came to be laying on the ground, and thus the gun is linked to the vehicle driven by the Defendant at best by inference based on circumstantial evidence, and at worst by speculation; (2) Officer Barrington was able to *passively* observe the gun laying on the ground without taking any active steps or making any active efforts to discover evidence of criminal activity; (3) Officer Barrington was able to observe the gun without further intruding upon the Defendant's constitutional rights beyond the initial intrusion of the unlawful investigative stop itself; and (4) Officer Barrington's observation of the gun did not impinge upon any of the Defendant's rights that Terry and its progeny were intended to protect.

**D.  The Defendant's "standing" to challenge the discovery of the handgun**

The Government's final argument, which was only minimally developed at the suppression hearing and in its memoranda [Docs. 22, 28, and 31], is that the Defendant lacks "standing" to challenge the discovery of the handgun by Officer Barrington because he has no constitutionally protected ownership or privacy interests in the gun itself or in the alleyway in which the gun was found. The Court notes that "characterizing the question as one of 'standing' miscasts the issue." United States v. Britton, 335 Fed. App'x 571, 574 (6th Cir. July 1, 2009). "[T]he matter of standing in the context of searches and seizures actually involve[s] substantive Fourth Amendment law [in

which]...a defendant must prove a legitimate expectation of privacy as a prerequisite to challenging assertedly unlawful police conduct." Id. (quoting United States v. Smith, 263 F.3d 571, 581-82 (6th Cir. 2001). Because the Court has fully discussed the factual deficiencies in this case that prevent it from making a finding concerning whether the Defendant abandoned the handgun, and whether that abandonment, if it occurred, was before or after the unlawful seizure, there is no need for a separate elaboration of the doctrine of legitimate expectations of privacy.

## III. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Defendant's Motions to Suppress Evidence **[Docs. 12 and 19]** be **GRANTED** in part, to the extent that the holster should be suppressed, and **DENIED** in part, to the extent that the firearm should not be suppressed.[18]

Respectfully Submitted,

    s/ C. Clifford Shirley, Jr.

United States Magistrate Judge

---

[18] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).